Filed 10/7/16  P. v. Connors CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH T. CONNORS,<br><br>        Defendant and Appellant. | A143072<br><br>(Alameda County<br>Super. Ct. No. H53176B) |

On January 4, 2011, Maurice Collins was shot to death in his home.  The following day, defendant Joseph Connors told the police that his friend, Richard Delosangeles, confessed to the shooting.  After Delosangeles was arrested, he admitted shooting Collins during an attempted burglary but said defendant was with him at the time, had come up with the idea of burglarizing Collins's apartment, and had provided the murder weapon.  Defendant was convicted of first degree murder and sentenced to life in prison without the possibility of parole.  He appeals, asserting eight claimed errors.  We agree only with his final argument—that a $10,000 parole revocation fine imposed but suspended by the trial court should be stricken.  With this modification, we otherwise affirm, as defendant's remaining arguments lack merit.

**BACKGROUND**

By information filed on December 26, 2012, defendant and Delosangeles were charged with the murder of Maurice Collins (Pen. Code, § 187, subd. (a)), with a special circumstance allegation that Delosangeles committed the murder while he was engaged in the commission of a burglary and that defendant was an accomplice in the burglary

1

(*id*., § 190.2, subd. (a)(17)(G)). It was further alleged that Delosangeles personally and intentionally discharged a firearm and caused great bodily injury and death to Collins (*id.*, §§ 12022.7, subd. (a), 12022.53, subd. (d)) and personally used a firearm (*id.*, § 12022.5, subd. (a)), and that defendant was armed with a firearm (*id.*, § 12022, subd. (a)(1)).

Prior to trial, Delosangeles pleaded guilty to second degree murder in exchange for a sentence of 15 years to life with the possibility for parole conditioned upon his truthful testimony at defendant's trial.

Following a jury trial in June and July 2014, defendant was found guilty of first degree murder, with the jury finding true the special circumstance that the murder was committed while defendant was an accomplice in the commission of a burglary.

On September 15, 2014, defendant was sentenced to life in prison without possibility of parole.

## EVIDENCE AT TRIAL

### *Gina Vannucci*

Gina Vannucci and her boyfriend, Maurice ("Reese") Collins, lived in Hayward in a second floor apartment that had a balcony off the living room. Collins sold marijuana around the neighborhood, most typically on Dixon Street, which was just down the hill from where they lived.

On the night of January 4, 2011, Vannucci and Collins were hanging out at home. Collins's cell phone kept ringing, but he did not have any marijuana to sell so he set his phone to silent.

Around 11:00 p.m., they got into bed to watch television. Collins had a gun that he usually kept on the floor next to the bed when he was sleeping. As they were going to sleep, they heard a loud noise. Collins attributed it to a neighbor, so they ignored it and fell asleep. Vannucci was awakened again, this time by gunshots. She opened her eyes but did not notice details of what happened other than "all this chaotic stuff": "I just remember nothing there, like, like nobody—like the door was just wide open and all the lights were on, and, hmm, it just didn't seem real. So when I turned over to look at Reese

2

that's when I seen that all this blood was coming from him." She jumped up, started screaming, and called 911.

Vannucci did not know how many people had entered the apartment. In the 911 call, she told the operator she had not seen anyone but she talked about an assailant in the singular. When asked at trial if on the night of the incident she was under the impression there had only been one assailant, she testified, "On the night of the incident I had no idea. When it happened, it's just a normal reaction, oh, my God somebody broke in. So when I say somebody, I don't know, I'm just saying."

Collins's gun was lying on the ground next to him, so Vannucci picked it up in case anyone was still in the apartment. The bedroom door had been kicked open, the balcony door was open, and there was mud on the living room carpet.

Vannucci testified that she knew defendant from times he had purchased marijuana from Collins and was familiar with Delosangeles from having seen him and defendant walking around on Dixon Street.

### Maria Guerrero

Maria Guerrero and her two daughters lived in the first floor apartment directly below Vannucci and Collins. On the night of January 4, 2011, she was putting her daughters to bed when she heard the patio door of the upstairs unit open. She then heard "very loud noises," including Vannucci's voice, coming from the bedroom above hers. She got up and was debating whether to call for help when she heard "amazing thunder." She "thought that somebody had taken a huge closet, some kind of drawer, picked it up and just hurdled it onto the floor because the ceiling of [her] bedroom just resonated so loud." She heard Vannucci crying and yelling, "get out, get out" and "a whole bunch of thudding like footsteps . . . ." She heard jumping on her balcony and walked to the window, where she saw two men "flying" away. She saw that one of the men was wearing a beanie or a hat, which she described to a police officer as red. She also told an officer she saw a pickup truck that could have been associated with the incident and she was under the impression the men got into the truck, although she did not see them get in. At trial, she testified it was "rash" of her to make that assumption.

3

### *Richard Delosangeles*

Richard ("Dumbo"[1]) Delosangeles, who was 25 years old at the time of trial, testified pursuant to a deal with the prosecutor that he plead guilty to second degree murder, for which he would receive a sentence of 15 years to life in prison if he testified truthfully in defendant's trial. He was otherwise facing life without possibility of parole, and he agreed it was "a pretty good deal . . . ." He testified as follows:

Delosangeles met defendant when he was 17 or 18 years old. He did not know him very well those first years but by 2011, when Delosangeles was 22 years old, the two of them hung out together about four times a week. At that time, he smoked a lot of marijuana, often with defendant and defendant's sister, Megan Connors.[2] Delosangeles had a cousin named Cristina Esquibel, who was friends with defendant. He did not know Collins, although he acknowledged he and Esquibel were with defendant one time when defendant purchased marijuana from Collins at his apartment.

On the evening of January 4, 2011, Delosangeles was hanging out at Esquibel's house. He was wearing blue jeans, black shoes, a black shirt and sweater, and a black and gray Pittsburgh baseball cap. Defendant showed up around 7:00 or 8:00 p.m. and the two left, first walking to a Subway sandwich shop where Megan worked, with all three of them continuing on to the Connors's house.[3] There, they smoked marijuana but eventually ran out, so defendant called Collins. Delosangeles and defendant then left to walk to Collins's house.

Once there, defendant knocked for a few minutes but no one answered, so they decided to return to the Connors's house. On the walk back, defendant suggested they burglarize Collins's apartment.

---

[1] Dumbo was Delosangeles's moniker from when he was a member of Norteño-affiliated Decoto street gang, which he joined when he was 12 years old. He testified that he dropped out when he was 18 years old.

[2] We refer to Megan by her first name in order to avoid confusion with defendant.

[3] Defendant and Megan both lived at their grandmother's house.

4

Back at the house, defendant continued to talk about the proposed burglary. At first, Delosangeles did not want to do it, but he then agreed. He believed no one was home because Collins had not answered defendant's telephone calls and no one had answered the door. Defendant suggested they climb a tree onto the balcony and break open a sliding glass door with a flathead screwdriver from defendant's garage. Defendant gave Delosangeles a gun they had stolen from a stripper in San Francisco. Delosangeles also had gloves, a mask, a hat, and a black hooded sweatshirt. Defendant was wearing a bulletproof vest under a red jacket and a red hat, not a black WyoTech[4] shirt with a white shirt underneath. According to Delosangeles, he was armed and defendant was wearing the bulletproof vest "[j]ust in case."

They walked back to Collins's apartment, and Delosangeles followed defendant to a tree next to Collins's balcony. They climbed the tree, and defendant used the screwdriver to open the sliding glass door on the balcony. Delosangeles went in first and pulled out the gun. The lights were off and they did not hear anyone inside. They walked into the living room, and Delosangeles looked in a closet and found a purse containing a wallet.

Defendant tried to open the bedroom door, but it was locked. He suggested they kick the door open because there could be jewelry in the room, so they both tried to kick it open, with defendant giving it a kick that eventually opened the door. Delosangeles went in first, with defendant behind him. Vannucci sat up and started screaming, waking Collins up. Delosangeles demanded that she shut up. Collins then stood up and pointed a gun at Delosangeles. Delosangeles ducked, covered his face, and fired his gun one time. He believed Collins also fired at him because he heard two shots.

Delosangeles fled the apartment by jumping off the balcony. He did not see defendant flee, but less than a block away, he ran into him and told him he might have shot Collins. He gave the gun to defendant, who checked it and said there were two

---

[4] WyoTech is a vocational program in which defendant was apparently enrolled at the time.

5

bullets missing. Defendant wrapped the gun in a shirt and hid it in a bush at the nearby Stony Brook Park. They ran up a hill to get away, staying there for a few minutes. Delosangeles took off his hoodie and defendant removed his red jacket and bulletproof vest, and they hid the items in a bush. They returned to Collins's apartment building and saw that the police were there. They walked away, heading towards defendant's house. When they were about a block away, a friend of defendant's sister drove up, and they got in her car.

They drove back to the Connors's house and hung out with Megan and her friend. They talked about how "something bad must [have] happened over at those apartments," but they did not tell the girls they were involved. They eventually walked to an Arco gas station to buy a cigar, Delosangeles wearing a white sweatshirt he borrowed from defendant and defendant wearing a black jacket. On their way back, they purchased marijuana from a man on the street and went behind a nearby apartment building to smoke it. They talked about what happened, Delosangeles saying he hoped he had not shot Collins. They then returned to defendant's house for the night.

The next morning, Delosangeles and defendant returned to pick up the clothing they had hidden under the bush. They took it to San Francisco, where they went to hang out with two friends, Jonathan Guerron and Gary Cornell. They talked about what happened the prior evening, but Delosangeles did not know defendant was recording the conversation. When he later heard the recordings, he believed defendant was trying to get him to incriminate himself.

On May 18, Delosangeles was arrested at a San Francisco nightclub. He told the police three different versions of what happened the night he murdered Collins. He first denied knowing anything about it. When the police showed him a tape of defendant telling the police he, Delosangeles, shot Collins, Delosangeles became upset that defendant snitched on him, so he said that defendant in fact shot Collins. He then told a third story, that they went to Collins's apartment to burglarize it and that he was frightened when Collins shot at him so he shot back. Delosangeles believed this was the truth, only learning after he was arrested that Collins had not fired a shot and that he had

6

in fact fired two.[5]  His intention in going into the bedroom was to steal, not to kill anyone.

When Delosangeles was interviewed by the police, he said he used to buy " 'trees' " from Collins, that Collins was " 'an old friend,' " and that if Collins shorted him on a marijuana purchase, he would call Collins, who would make it right.  At trial, he claimed that he was lying to the police when he said that, maintaining that he "didn't even know him at all."

### *Kyra Daug*

Kyra Daug was a friend of Megan Connors, through whom she met defendant and Delosangeles.  In January 2011, Daug was romantically involved with defendant, and she, defendant, and Megan all smoked a lot of marijuana together.

Shortly after midnight on the morning of January 5, Daug was driving to the Connors's house to visit Megan when she saw defendant, who was wearing a white shirt, walking down the street in front of Stony Brook Park near his house.  She thought he was alone because there was no one beside him.  She stopped to give him a ride, and then she saw Delosangeles, who had been walking about 10 feet behind him.  Both men got in her car and they continued on to the Connors's house, where they hung out and smoked marijuana.  Around 12:45 p.m., the two men left.  Defendant was not wearing a red hat when she picked him up.

In April 2011, prior to defendant's arrest, Daug had a conversation with defendant in which he told her he was in Collins's home "but he didn't have any part to do with the real big issue which was the murder."  He told her he was there because Delosangeles "had had some of his weed pinched from his bag and . . . wanted to teach [Collins] a lesson, to scare him."  He also told her he had been wearing his WyoTech shirt.  She responded that she remembered he was wearing a white shirt.  He told her it was important to remember that he had been wearing a WyoTech shirt.  Daug acknowledged that it was possible she was under the influence of marijuana during the conversation

---

[5] Two .40-caliber casings were found in the bedroom, while no .9-mm casings were recovered.

7

with defendant, and that at the time of the conversation she did not have a good memory because she was smoking a lot of marijuana. She did not remember certain details about the conversation, including whether it was in person or on the telephone. She acknowledged it was possible that defendant could have told her he was there before the murder occurred or that he was there after the murder occurred.

Daug admitted at trial that in an earlier conversation with the prosecutor she said defendant was wearing a WyoTech shirt when she picked him up. She testified that that was not true, and she had said that because she did not want to hurt defendant. She also told the prosecutor that defendant told her he and Delosangeles went to Collins's home to rob him.

On rebuttal, the prosecution called an inspector from the district attorney's office, who testified that in an interview Daug had said defendant was wearing a Wyotech shirt when she picked him up. After he reminded her about the importance of telling the truth, she became very upset. She admitted defendant had talked to her about what shirt he had been wearing, and she told the inspector that he had in fact been wearing a white shirt, not a Wyotech shirt. She also told the inspector that defendant told her he was there at the time of the murder but was not the shooter. The inspector further testified that the prosecutor had not done anything to threaten Daug in an attempt to coerce testimony from her.

### *Sergeant Guy Jakub*

Sergeant Guy Jakub was the primary investigator into Collins's murder. Around 10:30 p.m. on January 5, defendant contacted the police to report that he had information regarding the murder. Jakub called him back, and defendant told him his friend, Delosangeles, had admitted he murdered Collins. Defendant said he had been recording Delosangeles throughout the night and that he also had Delosangeles's baseball cap and could get the gun. They arranged to meet the following day.

Defendant arrived at the police department at the designated time. He immediately handed Jakub a black and grey baseball cap with a yellow 'P' that he said Delosangeles was wearing when he murdered Collins. Defendant also said Delosangeles

8

had told him where he had hidden the murder weapon. Defendant accompanied Jakub and another officer to Stony Brook Park two or three blocks from Collins's apartment and led them right to the gun, which was under a bush.

After returning to the police station, defendant told Jakub that on the evening of January 4, he went to a Subway sandwich shop where his sister worked. She was not going to get off work until around 10:30 p.m., so he walked to Esquibel's house to hang out. Delosangeles arrived there around 8:00 p.m., and they left together around 10:15 p.m. to go to Subway. Megan got off work around 10:45 p.m. and then drove all three of them to the Connors's house, arriving around 10:55 p.m. Once there, Delosangeles told defendant he wanted to buy marijuana, so defendant tried to contact Collins, calling multiple times between 11:00 p.m. and midnight but receiving no answer. Defendant told Jakub that he regularly purchased marijuana from Collins and had also smoked marijuana with him on the balcony of his apartment.

According to defendant, sometime between 11:00 p.m. and 11:20 p.m., Delosangeles left by himself to go purchase marijuana on Dixon Street. Defendant claimed that during that time, he stayed home with his sister.

Defendant told Jakub that around midnight, he decided to purchase a cigar from a nearby 7 Star liquor store. He walked there, wearing a black and orange Giants cap, a WyoTech black and blue shirt, gray tennis shoes, and blue jeans. The store was closed, however, so he decided to return home. On his way back, he ran into Delosangeles, who was wearing a black hooded sweatshirt, the black and gray baseball cap, and jeans. As they were walking, Daug drove by. She picked them up and took them to the Connors's house, by which time it was about 12:15 a.m. There, Delosangeles asked to borrow a white sweatshirt, which defendant loaned him. Defendant got his black jacket, and together they walked to a nearby Arco gas station to get a cigar, arriving around 12:30 a.m. From there, they walked to Dixon Street, where they bought some marijuana and smoked it behind an apartment complex on Dixon. They then walked back to the Connors's house where they stayed for the remainder of the night.

9

Defendant told Jakub that at 11:30 a.m. the next day, he and Delosangeles went to San Francisco and met up with Guerron and Cornell. Guerron mentioned a news story about Hayward's first murder of the new year. Delosangeles confessed he had committed the murder.

During the interview, defendant gave Jakub his phone, saying that he had erased his text messages. They listened to the recordings defendant had made of Delosangeles, which consisted of 11 different segments of short conversations, rather than a single "long recording like [the police] would normally . . . see if we were recording somebody." As Jakub described the recordings, "Short as in, I believe most of the recordings were maybe less than a minute long or about a minute long or maybe 30 seconds long. It would be usually Connors bringing something up and Delosangeles trying to answer or you just hear that kind of loud voice." Defendant admitted to him that the recordings were incomplete, claiming that when he tried to record Delosangeles, his friends kept looking at him funny so he kept turning his phone off.

During a break in the interview, defendant was left alone in the interview room. From a monitor, Jakub observed him wiping down two plastic bottles from which he had been drinking. At trial, defendant admitted he wiped his fingerprints off both bottles.

Around 10:30 p.m. that night, defendant called Jakub to say that he had run into Esquibel and Delosangeles. Delosangeles asked what defendant had done with the hat he had given him. Defendant told him he had burned it, which Delosangeles agreed was a good idea. Delosangeles then gave him the mask, black hooded sweatshirt, and gloves and asked defendant to burn those also. Defendant said he told Delosangeles he would do that, but he told Jakub he would bring them to him instead.

On January 7, Jakub met defendant, who gave him the items. Jakub also obtained a DNA sample from defendant since defendant had handled the items he turned over. DNA from both Delosangeles and defendant was found on the mask, gloves, and sweatshirt.

As part of his investigation, Jakub reviewed video surveillance from the Arco gas station. It showed defendant and Delosangeles walking up to the window and purchasing

a cigar. Defendant can clearly be seen wearing a red hat, although he told Jakub in the first interview that his hat was black. Delosangeles was wearing a white hooded sweatshirt.

In a conversation on January 9, defendant changed his story and told Jakub that he was wearing a different color hat. Jakub asked defendant to bring him the white sweatshirt Delosangeles was wearing, which he later did. Defendant also told Jakub he wanted to add something to his original statement, because he had just remembered that he and Delosangeles had smoked marijuana with a man named Terrance House on the night the murder took place. According to defendant, when they were together, Delosangeles was showing off the gun he used to shoot Collins. Jakub spoke with House, who denied that Delosangeles showed him a gun.

Jakub interviewed Daug, who said she picked up defendant on her way home from a movie. When he asked her what defendant was wearing, she said, " 'I saw that bright white shirt he was wearing. Long T, bright white shirt with short sleeves.' "

Jakub again interviewed defendant on January 13. Defendant brought the clothing he said he had been wearing the night of the murder, including a WyoTech school shirt, a black trench coat, gray tennis shoes, and the red Phillies cap he was seen wearing in the Arco surveillance video.

Also as part of his investigation, Jakub obtained search warrants for 13 different phone numbers, including defendant's. He testified regarding numerous text messages that were recovered, including the following:

On December 30, 2010, defendant texted Cornell, " 'do you know of any licks in . . . SF.' " Jakub testified that a lick is a robbery.

On January 3, 2011, defendant's cousin texted him, " 'is it real or a BB gun.' " Defendant responded, " '40 cal.' "

On January 4, starting at 5:26 p.m., defendant exchanged texts with Guerron. In one, defendant said, " 'I'm selling my best for 700, know anyone.' " Guerron responded, " 'why are you trying to sell that gun, that's a keeper.' " Defendant answered, " 'I need to get that warrant off and get a guard card.' "

11

At 6:46 p.m. that day, defendant texted his cousin, " '700 for the gun with a bulletproof vest.' "

On January 7, Cornell texted defendant, " 'you good.' " Defendant responded, " 'I'm great. Dumbo is not. He thinks they are going to catch him. He's thinking about going on the run. Don't know why he had to shoot somebody.' " Cornell texted back, " 'you still got that thing,' " and then, " '??,' " to which defendant responded, " 'threw it' " and " 'in the sea.' " Cornell responded, " 'Okay,' " and defendant texted back, " 'I mean Dumbo is hella spooked.' "

In a May 3 interview, Jakub confronted defendant about the texts. Defendant denied he was trying to sell a gun, claiming instead that he sent his cousin a picture of Delosangeles's gun lying next to a BB gun, and that was what he was talking about.

As to the text about a lick, Jakub testified that defendant did not deny he was looking for a robbery to commit. Instead, "[h]e basically explained to me that, yeah, he was looking to come up, is how he used the term, he was looking to come up on somebody and sometimes he thinks about it but he hasn't gone through with anything like that in sometime. He didn't at that time."

Defendant was arrested in June 2011.

**Defense Case**

*Megan Connors*

In January 2011, Megan was living at her grandmother's house in Hayward with her grandmother and defendant. She was working at a Subway sandwich shop and going to school. A little after 10:00 p.m. on the night of January 4, defendant and Delosangeles showed up at Subway when she was working. They all left around 10:20 p.m. and went to the Connors's home, where they smoked marijuana. Around 11:15 p.m., Delosangeles left alone to go get more marijuana. Delosangeles eventually returned, asking defendant if he could borrow a sweatshirt. Defendant got a sweatshirt from Megan and gave it to him. Defendant and Delosangeles then left to get a cigar from the 7 Star liquor store. They returned with Daug, saying they had gone to Arco. Eventually, defendant and

Delosangeles went to bed, and Megan later did as well. Megan did not recall saying that defendant was still at the house when Daug showed up.

The prosecutor played a recording of defendant in which he was heard telling someone, " 'You see, the thing is my sister would vouch for him so it's good. Even if they find his fingerprints, my sister would say he was at my house, so he's all good on that level; you know what I mean? He can't get caught 'cuz it's true, you know what I mean, you were at my house. My grandmother would probably be, like, yeah, they were playing video games or something, you know what I mean, because my grandmother forgets when I'm there.' "

### Defendant

In January 2011, 20-year-old defendant was in school and would work odd jobs or get money from his grandmother. He was hanging out with Delosangeles, whom he knew to be a Decoto gang member, typically smoking marijuana, drinking, and going to raves. He often bought marijuana from Collins because he was close by. He remembered one time Delosangeles was with him when he bought marijuana from Collins at his apartment.

On January 4, defendant was at Esquibel's house with Delosangeles and others. Around 10:15 p.m., he and Delosangeles walked over to the Subway sandwich shop where his sister worked. He was wearing his WyoTech shirt with a white T-shirt underneath, and Delosangeles was wearing a black hooded sweatshirt and a Pittsburgh baseball cap. They hung out until Megan got off work, and then Megan drove them all to the Connors's house. Megan did not want to share her marijuana unless Delosangeles pitched in, so Delosangeles asked defendant if he could find some, and defendant tried unsuccessfully to contact Collins. Unable to reach Collins, defendant put his phone away and did not think about it anymore.

Delosangeles told defendant he was going to go buy some marijuana and left. Defendant stayed behind and continued to hang out with his sister and a friend. A few minutes after midnight, he decided to go to the 7 Star liquor store to buy cigarettes. He walked to the store but it was closed so he started walking back, intending to go back to

13

his house to get warm clothing. As he was walking, Delosangeles came out from the side of an apartment building and "looked kind of frantic" "like he was in a hurry." They started walking together, and within a minute, Daug drove by. She stopped when she saw them and gave them a ride back to the house. As they drove, defendant noticed flashing lights in the parking lot of Collins's apartment building.

At the house, defendant got his black jacket and red hat. Delosangeles said he did not want to wear his black hooded sweatshirt anymore, so defendant gave him a white hooded sweatshirt. They then left to walk to an Arco gas station to buy cigars. From there, they walked down Dixon Street and bought marijuana from a man on the street, which they smoked as they walked down the street. Near defendant's house, they encountered a man named Terrance House, who was smoking marijuana. Defendant smoked some with him, and as they were hanging out, Delosangeles showed off a gun he had with him. They returned to defendant's house close to 1:00 a.m. and stayed there for the night.

The next morning, defendant knew something was wrong with Delosangeles because he was crying. They made plans to go to San Francisco, and while they were on a train to the city, Delosangeles started talking about what had happened. He told defendant "about how he got into some trouble the night before and some dude shot at him and he shot back and he doesn't know if he killed the dude or not." Delosangeles took out his gun, and defendant saw that it was missing two bullets, although Delosangeles kept swearing he only fired one shot. The gun was a .40-caliber pistol, the same one defendant mentioned in a text that he was trying to sell. Asked to explain the text, defendant testified, "I sent that just to my cousin trying to act cool and she thought it was a BB gun, and I told her it was real and all that stuff. She knows a lot of people, so I was, like, trying to sell it for him, but I said it was mine. I think it's easier to sell something when you say it's yours than someone else's."

In San Francisco, defendant and Delosangeles went to hang out with Guerron and Cornell. They were talking about what happened the night before. Guerron looked on his phone and saw that the first murder of the year had occurred in Hayward the previous

night. Delosangeles started bragging about it. Initially, defendant was not going to say anything about what Delosangeles had done, but he was upset that he was bragging about killing someone defendant knew so defendant started recording him. He started egging Delosangeles on, trying to get him to talk about what he had done so defendant could take it to the police. Defendant denied that he deleted any recordings or that he intentionally did not record parts of the conversation that incriminated himself.

Defendant told Delosangeles that he could destroy his clothing for him. He did not intend to do so and planned instead to give it to the police. Delosangeles first gave him the hat, and later the mask, gloves, and sweater, all of which defendant gave to Jakub. Delosangeles then gave defendant directions to the gun. Jakub thanked defendant for help obtaining the gun and defendant's own clothing, which Jakub told him would rule him out as a suspect. Defendant told Jakub he was wearing a black and orange hat with earmuffs, although he was unsure if that was correct and told Jakub he would let them know if he was mistaken. Jakub also asked for his cell phone, which defendant gave him, although he told him he had erased his text messages for privacy reasons.

Defendant testified that although Delosangeles still had the gun at that point, he believed he could get the gun "because at the time that [Delosangeles] was—at the time he pretty much trusted me. I told him pretty much I knew how to get rid of the gun, cuz the gun was mainly plastic at the time and it's easy to burn stuff."

Defendant spoke with Daug in March 2011. He knew from the police that Daug said he was wearing a bright white shirt when she encountered him on the night of the murder. He told her he was wearing a WyoTech shirt, and she said she remembered a white shirt. He denied that he told her that she needed to say he had on a WyoTech shirt, and he denied telling her that he was present when Delosangeles shot Collins. Asked why she would lie, defendant suggested that the prosecutor created a ruse (accusing her of being involved in the crime) to get her to falsely testify.

## DEFENDANT'S ARGUMENTS

Defendant asserts the following eight arguments: (1) the trial court violated his right to a fair trial by failing to instruct on the lesser included offenses of second degree

15

murder and voluntary manslaughter; (2) alternatively, if the failure to give lesser included offense instructions was invited error by defendant's counsel, then defendant was deprived of his right to effective assistance of counsel; (3) the trial court violated defendant's right to a fair trial by refusing to instruct on CALCRIM No. 373, which pertains to evidence that another person who is not a codefendant may have been involved in the crime; (4) the conviction violated defendant's constitutional rights because there was no corroboration of Delosangeles's testimony; (5) the trial court's instruction on aiding and abetting liability for first degree murder on a natural and probable consequences theory was incorrect; (6) the cumulative error violated defendant's right to due process; (7) defendant's sentence of life in prison without the possibility of parole constitutes cruel and unusual punishment; and (8) a $10,000 parole revocation fine should be stricken.

## DISCUSSION

### A. The Trial Court Did Not Err in Failing to Instruct the Jury on Lesser Included Offenses

As noted, the information charged defendant and Delosangeles with first degree murder. Defendant did not request that the jury be instructed on any lesser included offenses. In fact, his counsel expressly confirmed in the following exchange that defendant did not want any such instructions:

"THE COURT: Record should reflect I have had an instruction conference with both attorneys. I wanted to clarify for the record the state of the evidence is such that Mr. Connors is denying any culpability in that he was not at the scene, so the defense is not requesting any lesser-included instructions under any theory such as *Flannel* [citation] or anything else. I am inclined to agree with counsel that there really wouldn't be a basis for lesser-included instructions, so Mr. Bryden [counsel for defendant], you are not requesting any lesser instructions; is that correct?

"MR. BRYDEN: That is correct. I have not requested any lesser instructions, your Honor.

16

"THE COURT:   And the People agree with the Court that we're not going to instruct on any lessers because it's a felony murder, so it would be a first degree or it would be nothing.

"MR. WILSON [the prosecutor]:   That is my [understanding] of the law, your Honor."

Defendant now contends that the trial court had a sua sponte duty to instruct on lesser included offenses—specifically, second degree murder and voluntary manslaughter—despite his counsel's agreement with the court and the prosecutor that the instructions should not be given.  This was so, he claims, because the record contained substantial evidence from which the jury could reasonably conclude that defendant was guilty only of those lesser offenses.  We independently review his claim of instructional error (*People v. Waidla* (2000) 22 Cal.4th 690, 733;  *People v. Cooksey* (2002) 95 Cal.App.4th 1407, 1411), and we conclude his claim lacks merit.[6]

The trial court has a duty to instruct on lesser included offenses "whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury.  [Citations.]  'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed.  [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)  This is so "notwithstanding a defendant's objection that such instruction is inconsistent with his or her theory of the case . . . ." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1345.)

---

[6] Defendant concedes that second degree murder and voluntary manslaughter are not in fact lesser included offenses of felony murder, which is murder "committed in the perpetration of, or attempt to perpetrate [enumerated felonies including burglary and robbery] . . . ." (Pen. Code, § 189; see, e.g., *People v. Banks* (2014) 59 Cal.4th 1113, 1160 (*Banks*) [declining to reach question whether second degree murder is a lesser included offense of felony murder under the statutory elements test]; *People v. Campbell* (2015) 233 Cal.App.4th 148, 160, fn. 4 [noting that the Supreme Court left that question open in *Banks*].)  But he argues that because the accusatory pleading charged him with first degree murder, he was on notice that he might be convicted of lesser included offenses, namely, second degree murder and voluntary manslaughter.

17

Here, Delosangeles testified he shot and killed Collins during the course of an attempted burglary. The only question as to defendant was whether he was present. If so—and as the jury found—he was guilty of felony murder. If not, he was not guilty of any other crime. Defendant's suggestion that the court should nevertheless have instructed on second degree murder and voluntary manslaughter is completely inconsistent with the evidence and arguments presented at trial.

Further, there was no evidence—substantial or otherwise—supporting a theory that defendant committed second degree murder or voluntary manslaughter. Defendant argues, "[T]here was substantial evidence that the homicide was either second degree murder or voluntary manslaughter, the latter motivated by imperfect self-defense. Co-defendant Richard Delosangeles testified that he shot Maurice Collins but shot him only after Collins pointed a gun at him. He ducked, covered his face and shot. He thought that Collins had shot his gun at him. [Citation.] Appellant's trial counsel also suggested that the killing was a gang-style execution by Delosangeles, a former member of the Decoto gang, a Norteno gang, which sold drugs in the area. . . . [¶] The jury could have concluded that the shooting was not in connection with a burglary and that the homicide was not premeditated. The jury also may have concluded that the homicide was an unlawful killing committed without malice aforethought, and was thus manslaughter."

As to the murder having been a gang-style execution, defense counsel's suggestion was not evidence. As to manslaughter based on imperfect self-defense, the doctrine "may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.]" (*People v. Randle* (2005) 35 Cal.4th 987, 1001.)

Because we conclude there was no error in not instructing on second degree murder and voluntary manslaughter, we need not reach defendant's alternative argument that he received ineffective assistance of counsel because his attorney invited the error by agreeing that lesser included offenses instructions were improper.

18

**B. The Trial Court Did Not Err in Rejecting Defendant's Request to Give CALCRIM No. 373**

Counsel for defendant requested that the court give CALCRIM No. 373, which instructs: "The evidence shows that (another person/other persons) may have been involved in the commission of the crime[s] charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must not speculate about whether (that other person has/those other persons have) been or will be prosecuted. Your duty is to decide whether the defendant on trial here committed the crime[s] charged. [¶] [This instruction does not apply to the testimony of <insert names of testifying coparticipants>.]"

The court declined to give the instruction, as follows:

"THE COURT: [¶] . . . [¶] Mr. Bryden was asking for 373, other perpetrator. This was based on the theory that the one witness, the downstairs neighbor, saw two males jumping over the fence. The only evidence and testimony I have heard is about Mr. Connors being the second person with Mr. Delosangeles. There is no other perpetrator. I believe the purpose of 373 is if there was another suspect or defendant out there, you would give 373. So I'm going to deny it. That's with the People's consent; is that correct.

"MR. WILSON: That is true.

"THE COURT: And Mr. Bryden wished to make a record. Proceed, Counsel.

"MR. BRYDEN: The record would be that I asked for it, that Mr. Connors testified that he wasn't there. There were two persons; there was another perpetrator, so I believe 373 fits the state of the evidence.

"THE COURT: Well, I don't know. Out of an abundance of caution, would the People have any objection if I gave it? I don't know, I really don't think it applies.

"MR. WILSON: I honestly don't think it applies either, your Honor, so I would object.

19

"THE COURT:   I'm going to have to agree with the prosecutor.  I will not give 373.  Record should reflect Mr. Bryden did request it, and I'm denying it because I don't feel it applies."

Defendant contends that the trial court's refusal to give CALCRIM No. 373 violated his right to due process because there was substantial evidence that Delosangeles had an accomplice that was someone other than defendant.  This was so, according to defendant, because Collins's downstairs neighbor, Maria Guerroro, testified that she saw two men flee from her balcony but defendant repeatedly denied that he participated in the attempted burglary.  Defendant cites no authority supporting his theory that CALCRIM No. 373 is applicable when there is evidence of an accomplice, but the defendant denies that it was him.  Rather, the plain language of the instruction—that "someone who appears to have been involved might not be a codefendant in this particular trial"—indicates that the instruction applies where there was evidence specifically identifying another participant who was not jointly tried with defendant.  Case law is in accord.  (See, e.g., *People v. Bryant* (2014) 60 Cal.4th 335, 434–435; *People v. Sattiewhite* (2014) 59 Cal.4th 446, 478–479 [considering CALJIC No. 2.11.5, the CALJIC instruction on unjoined perpetrators]; *People v. Maciel* (2013) 57 Cal.4th 482, 538–539 [same]; *People v. Valdez* (2012) 55 Cal.4th 82, 149; *People v. Moore* (2011) 51 Cal.4th 1104, 1133–1134.)  There was no such evidence here, and thus no instructional error.

### C.   There Was Evidence Corroborating Delosangeles's Testimony That Defendant Was His Accomplice in the Attempted Burglary of Collins's Apartment

Defendant next contends that his conviction must be reduced from first degree to second degree murder because there was no evidence corroborating Delosangeles's testimony that defendant was his accomplice in the attempted burglary of Collins's apartment.  He concedes "there may have been sufficient evidence independent of accomplice Delosangeles's testimony to establish that appellant Connors aided and abetted the homicide," but he claims that there was insufficient corroboration of

20

Delosangeles's testimony regarding the special circumstances, i.e., that the murder occurred during an attempted burglary. We question defendant's contention that an accomplice's testimony regarding a special circumstance requires corroboration, but we need not resolve this issue, since there was corroborating evidence establishing both that defendant aided and abetted the homicide and that the homicide occurred during the course of a burglary.

Penal Code section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." " 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense.' [Citation.] The evidence is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303; see also *People v. Chism* (2014) 58 Cal.4th 1266, 1301; *People v. Manibusan* (2013) 58 Cal.4th 40, 95; *People v. Zapien* (1993) 4 Cal.4th 929, 982; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1177–1178.)

The trial court instructed the jury with CALCRIM No. 335, the instruction on the requirement that there be evidence corroborating the accomplice's testimony. By finding defendant guilty of felony murder, the jury necessarily found there to be such evidence. The jury's finding is binding on us "unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime." (*People v. Abilez* (2007) 41 Cal.4th 472, 505.) Here, there was admissible, corroborating evidence connecting defendant to the attempted burglary.

Guerroro (Collins's downstairs neighbor) testified that she saw two men flee from her balcony, one of whom was wearing a red hat. Video surveillance shortly after the murder showed defendant and Delosangeles at a nearby Arco gas station. Defendant can be seen on the video wearing a red hat. Defendant initially told Jakub that he was

wearing an orange and black hat, a story he later changed to be consistent with the video surveillance.

Perhaps more incriminating—and certainly corroborating—was Daug's testimony. She told the prosecutor that defendant admitted to her he and Delosangeles went to Collins's apartment to rob him. Daug also testified that she picked up defendant and Delosangeles in front of Stony Brook Park on the night of the murder, the park in which defendant led the police to the murder weapon. She told Jakub and testified at trial that defendant was wearing a white shirt. This corroborated Delosangeles's testimony that after the murder, he and defendant returned to the Connors's house and changed into the clothing later seen on the Arco video surveillance.

Finally, the police obtained text messages from defendant's cell phone indicating that a few days before the murder, he was looking for a robbery to commit; the day before the murder, he was attempting to sell a .40-caliber handgun, the same type of gun as the murder weapon; and the day of the murder, he was attempting to sell the gun and a bulletproof vest.

### D. The Trial Court's Error on the Natural and Probable Consequences Instruction Does Not Require Reduction of Defendant's Offense to Second Degree Murder

The trial court instructed the jury on two different theories of first degree murder: felony murder and the natural and probable consequences doctrine. Under the latter, "an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' " (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) But in *People v. Chiu* (2014) 59 Cal.4th 155, 158–159, 166 (*Chiu*), the California Supreme Court held that an aider and abettor of a primary offense cannot be convicted of a first degree murder by the principal on the theory that the murder was a natural and probable consequence of the primary offense. Instead, "punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine."

(*Ibid*.)  In light of *Chiu*, defendant contends his offense must be reduced from first degree to second degree murder because the trial court instructed on an invalid legal theory—first degree murder based on natural and probable consequences.

The People rightly concede the trial court's instruction was erroneous.  This does not, however, require reduction of defendant's offense.  As the *Chiu* court stated:  "When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground."  (*Chiu, supra,* 59 Cal.4th at p. 167.)  There is a basis in the record for finding that the jury's verdict was based on a valid ground:  it found true the special circumstance allegation that "the murder was committed while the defendant was an accomplice in the commission of a crime of burglary."  Thus, the jury found defendant guilty of first degree murder under a valid theory on which it was properly instructed.

### E.  There Was No Cumulative Error

Because there was no error with respect to defendant's conviction, there was no cumulative error.

### F.  Defendant's Sentence of Life in Prison Without Possibility of Parole Did Not Violate the Prohibition Against Cruel and Unusual Punishment

In addition to challenging his conviction on the aforementioned grounds, defendant also challenges his sentence on the ground that it constituted cruel and unusual punishment.  His counsel asserted the same challenge at defendant's sentencing hearing, when he argued, "[y]our Honor, we would like to state that we would object to the imposition of a sentence of life without possibility of parole, as in this particular case being barred by the Eighth Amendment, in that it is highly unusual for an unarmed participant in a crime to face life without possibility of parole under the felony murder rule when someone else committed the fatal act.  And considering my client's youth and lack of an adult record as well, we believe the Eighth Amendment will bar that type of sentence."

23

The prosecutor disagreed, responding, "[t]here's nothing in the Eighth Amendment barring this defendant from being sentenced as you are about to sentence him. In fact, there have been cases [where] non-shooters have received life without the possibility of parole when the shooter has received a lesser sentence."

Without commenting on defendant's objection, the court then heard victim impact statements, following which it sentenced defendant to life in prison without the possibility of parole.

Defendant now contends that the court failed to rule on his Eighth Amendment objection, such that we should remand the matter in order for it to do so. And he goes on to argue that his sentence was cruel and unusual in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Section 17 of the California Constitution. Defendant's contention fails for two reasons.

First, the trial court was not required to expressly rule on defendant's objection. It heard his counsel's argument, the prosecutor's response, and then imposed the life without possibility of parole sentence. " '[A] trial court is presumed to have been aware of and followed the applicable law. [Citations.]' " (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114.) It therefore stands to reason that the court impliedly denied his objection.

Second, his argument fails on the merits. As defendant acknowledges, the statutorily prescribed minimum sentence for defendant's offense was life without possibility of parole. (See Pen. Code, § 190.2, subd. (a)(17)(G) [penalty for first degree murder committed during the commission of a burglary is death or imprisonment for life without the possibility of parole].) He contends, however, that "while the Legislature is entitled to great deference in terms of setting the punishment for criminal behavior, 'the final judgment as to whether the punishment [the Legislature] decrees exceeds constitutional limits is a judicial function.' " Defendant's sentence did not run afoul of the prohibition against cruel and unusual punishment.

"The concept of proportionality is central to the Eighth Amendment. Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' " (*Graham*

24

*v. Florida* (2010) 560 U.S. 48, 59, quoting *Weems v. United States* (1910) 217 U.S. 349, 367.)  With respect to state law, "[i]mposition of a sentence 'grossly disproportionate to the offense for which it is imposed' is a violation of the prohibition against cruel or unusual punishment under article I, section 17, of the California Constitution." (*People v. Kaurish* (1990) 52 Cal.3d 648, 716; see also *In re Lynch* (1972) 8 Cal.3d 410, 424 [sentence constitutes cruel and unusual punishment under the California Constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity."].)  We cannot agree that defendant's sentence was disproportionate to his crime.

Defendant was convicted of first degree murder during the commission of a burglary.  While he was not the shooter, the evidence showed that the burglary was his idea and that he provided the weapon.  He was familiar with Collins's apartment, having hung out and smoked marijuana on the balcony, and he knew that they could climb the tree to access the balcony and would need a screwdriver to open the sliding glass door.  This showed that the crime involved planning and sophistication.  Defendant was also clad in a bulletproof vest, evidencing his knowledge that he was engaging in a potentially violent undertaking that could result in great bodily injury or death.  He engaged in violent conduct in attempting to commit the burglary, kicking open the locked door of the bedroom in which the victim, Collins, and his girlfriend were sleeping.  And the victim was particularly vulnerable, as he was asleep in his bed at the time he was murdered.  Defendant never expressed remorse for his involvement in the murder, instead maintaining that he was not present despite the evidence showing otherwise.

Defendant also complains that Delosangeles, who was the actual shooter, was allowed to plead guilty to second degree murder and received a sentence of 15 years to life.  Evidence of sentences received by a coparticipant in an offense, however, is irrelevant to the proportionality of a defendant's sentence.  (*People v. Thomas* (2012) 54 Cal.4th 908, 940; see, e.g., *People v. Howard* (2010) 51 Cal.4th 15, 39–40 [court rejected defendant's challenge to his death sentence despite that his co-responsible, who actually shot the victim, was sentenced to life without the possibility of parole].)

25

Given these circumstances, we find no error in the sentence imposed.

**G.  The Parole Revocation Fine Must Be Stricken**

In his final argument, defendant contends that a $10,000 parole revocation fine, imposed but stayed by the trial court at the sentencing hearing, must be stricken.  The People concede the fine was erroneously imposed, a concession that is well taken. (*People v. Samaniego, supra,* 172 Cal.App.4th at p. 1184 [where defendant was sentenced to life without possibility of parole, "there can be no parole, and therefore the parole revocation fine was improperly assessed."].)  The fine must therefore be stricken.

## DISPOSITION

The judgment is modified by striking the $10,000 parole revocation fine.  As so modified, the judgment is affirmed.  The clerk of the superior court is directed to prepare an amended abstract of judgment and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.


_____

Richman, J.


We concur:


_____

Kline, P.J.


_____

Stewart, J.